You need to be quiet back there. You need to be quiet. All right, counsel. Good morning. May it please the court, I'm Alan Levins of Littler Mendelsohn. With me at the counsel table is Courtney Chambers. She assisted in the brief. We represent Delta Sandblasting, a small, family-owned, family-run company. It's been a union company for many years, which primarily sandblasts and paints ocean-going vessels. Our case is really simple. There was no detailed, written agreement, as required by Section 302c-5, for the additional pension contributions that the NLRB says we had to pay. Let me ask you this as a starter, though. I gather there's no dispute by either party that Delta is a party to and signed the 2008-2015 collective bargaining agreement that requires Delta to pay pension contributions to the Pacific Coast Shipyards Pension Fund. Do you agree with that? That's responded as one. We agree with that, absolutely. And the amount of the pension contributions were $1.95 per hour. Okay. So then we have the situation where, at least according to the record, the union representative and the Delta representative met, had a discussion, a rather informal one, but the Union representative gave a piece of paper. I gather it was called Schedule A. I don't know for sure, but that's what I understand. That was given to his wife, who implemented what that schedule said. Do you dispute that? Well, she didn't implement it. She went ahead and did what the union told her to do, but there was no detailed written agreement as required by 302c5. Well, I understand that. That's your legal point, but what I'm saying is you had an original agreement that you did sign. The parties were friendly, I gather, met. There was a document that was given. The person from Delta gave it to his wife, who handled the payments. She implemented, to my word, implemented what the document said and what her husband understood, moving up to a point when Delta didn't have the funds to make the payments that the union said were due. What's wrong about that? Well, that's accurate, yes. Okay, so I know you dispute about whether something more needs to be signed, but I tell you, you're a smart lawyer, a good lawyer. You know when you have a written agreement and you have something that people are friendly with each other, they deal with each other. When people carry out the terms of the agreement, that written agreement, even though all of it was not in writing, why would that not satisfy the requirements of the statute? You just kind of harken back to the original union agreement. Well, I think that would not at all comply with Section 302c5. I think Thurber and Moglia and the cases that are decided in the Ninth Circuit make it clear that this is a rigid requirement. Thurber uses the word rigid requirement and it's absolutely forbidden to have anything but a detailed written agreement expressing who the money is to be paid for, on what basis it's going to be paid for, and which employees. And if you look at this, I call it the AirSats or the fake Schedule A, the one that was supposedly waved around. None of that information is on there. Well, let me ask you this. What the gentleman from Delta told his wife, that, whether it was on that sheet or not, from your perspective, that was carried out for, what, two years? It was carried out for a period of time because my clients are unsophisticated. They had no way to know that that was not lawful. So the one thing that I'm confused about is, according to the record, Delta started paying the increased rate in April of 2014. Does that make sense to you? Is that your recollection, as well? No, I think it was later than that, but I think it was closer to 2015. Well, that's when December is when the meeting between Santana and Sanders occurred. In 2014, there was a, quote, meeting, yes. Right, and that's when his wife supposedly received the Schedule A. Well, I think what you have to do is look at the, if you look at Respondents 1, you will see a collective bargaining agreement that goes from page 1 to page 38. No missing pages. And you see in there, on page 37, or 35, you see in there a document that says Schedule A. That is the only Schedule A in this case. Now, if you look at the GC2, that is a similar document, but three pages have been taken out of it. There is no Schedule A in there. And the union business agent who testified at the NLRB admitted he has no idea why there's no Schedule A in the collective bargaining agreement. He has no idea how it was transmitted to the company. So we have one document that says Schedule A. Section 18.4 refers to Schedule A. That's Respondents 1. We're bound to that. But then we have this other document that does not have a Schedule A. 18.4 refers to Schedule A. There is no Schedule A in that document. Well, let me ask you this. Are you, did you seek before the NLRB, or do you seek in any proceeding to recover the difference between the language that clearly is in the collective bargaining agreement up to 2008, 2015? You said more was paid. You said that was never agreed to. Are you seeking to get that returned? Well, we'd love to. My understanding about the law in the Ninth Circuit is that that money cannot be returned. In preparing for today's argument, I came across a case, the name of which I forget, that specifically said, although it was Justice, it was Judge Warren, anyway, it was a judge in the district court. It was, I think, R.C. Cloud. And he held that, yes, under FACTS, very similar to our FACTS, he held, yes, the employer should not be required to make these contributions. There was not a specific written agreement. Detailed is required by 302c5. And then he went on to say, Schwarzer, and then he went on to say that, but the employer is not entitled under ERISA to sue for those damages. Maybe we'll make some new law at some point, but we have not tried that. I guess what concerns me about this, I practiced law for a long time, did a lot of contractual work. And this situation you're talking about, putting aside for a minute the National Labor Relations Act, this happens all the time, especially with small family businesses. Few people follow formalities here. They don't board meetings on time. They maybe don't this forum, that forum, the other, but it works because people are acting in good faith with one another. And what I'm seeing here is, you know, it's the people that knew each other, they went to dinner, they had, he said, this, by the way, this is the new deal, he gives it to his wife, she implements it, and then the company runs out of enough money to pay it. They have a problem with that. But what you're saying is that the fact that they didn't at that time have a lawyer with them who prepared Schedule A and every dot, and every jot and tittle was written, then it doesn't work. The book doesn't work that way, does it? Oh, absolutely. Well, let's put it this way. Before Congress passed 302c5, it did sort of kind of work that way. And a lot of trust funds were out money, and a lot of employers were out money. And Congress said, we're not going to allow this formal action any longer. This is, this causes people to think they have pensions when they don't. This causes employers to think they have to make payments when they don't. This permits union business agents to walk in and say, hey, I'll buy you a beer, just sign this, or allows business agents to come in and say, don't worry about it, just make the payments. By the way, I'll take a cut. Congress... I'm just looking at the board record. It says here that Delta started paying the required rate under the rehabilitation plan from April 2014 forward. I stand corrected. I thought it was later, but I thought... So you would agree that the $8, $8.18 was paid in April 2014? My recollection is that it was, it was paid after that. But if the board is correct, it was, it was in April. If the board was correct. And this supposed agreement happened in December of 2014, right? Right. So Delta could not have been paying the heightened fee based off of that agreement. Well, then the question is on what agreement was it paid its fee on? And that's the real question. Is it the rehab plan? Well, there's nothing in the record about any rehab plan. Respondents 1 is clear. As I said, page 1 through 38, Schedule A, 195, period. That's all that the employer was obligated to pay. What about the PPA, the Pension Protection Act? Doesn't that bind Delta to accept or adopt a rehab plan? Well, first, the pension, the PPA, assumes that there is a valid underlying agreement, which is not accurate in this case because it didn't come up. Yes, it is, because until there was, while they were negotiating the next one, the terms of the prior one was, in fact, in place. But there's no, well, the PPA says that at the expiration of the agreement, the parties will sit down and negotiate for a change. This contract expired in 2015. It didn't expire in 2014. We don't know the basis for these additional payments. We don't know whether the business agent came in and said, you've got to pay these, and you've got to pay them now. Or if he said, pay them now, and I'll take you to the ballgame. So you disagree that you're required to comply with the rehabilitation plan? Either, there's a 2008 rehabilitation plan. I believe it gets updated every year. So you don't believe Delta's bound by that? Correct. And how do you, how is that consistent with the PPA, which seems to suggest if it's, if there is, I forget the word they use, an exigency, you have to adopt a rehabilitation plan? Well, the parties have to negotiate about it, and the parties didn't negotiate about the $8 payment. What about the dinner? What about the dinner? I think the position of the other side is, yeah, they did talk about it. And that's what that form was, and that's what his wife implemented. That form, again, you have to look at that form. You have to look at Respondent 1 and GC2. The administrative law judge in this case said, whichever contract applies is a question of credibility, and yet she never resolved that question of credibility. Well, I thought she did, because ultimately the NLRB got the order. Well. That resolved it in the... Well, we have to examine to see whether that decision is supported by substantial evidence, which it isn't. But she didn't resolve it. All she said is the company is obligated to pay $1,198. It did pay $1,198 at one point. It went down to $195 when it realized there was a problem. That's a unilateral change. She never determined whether or not it should have been at $195, because 302c5 precluded any additional payment. Go ahead. I'm sorry. I was just reading ALJ's decision, and I thought she did find that the $195 was part of the CBA and did not believe the new Schedule A was part of the CBA. On page ER40, she says, specifically, the agreements Article 18.1 provides for a base contribution rate of $1.95 per hour. Right. So that means she did not find this new Schedule A was part of the contract. She — well, if she didn't, then there's no basis for her decision. Wait. I thought you would agree with that. Yes. Okay. But on page 10, she says that there was a failure to provide notice and an opportunity to bargain as being the issue. Well, that's a separate issue. The way I read it, she found that the Schedule A, the old Schedule A, the $195, was the one that was incorporated into the CBA, not the new one. Yes. Do you disagree with that? It was always in the CBA from day one. Right. Yes. And she never resolved that credibility issue, and the board never — as we said, we point out in our brief, there are — all the factors point against that determination, that there was a new Schedule A. But the reality is the ALJ obviously found that it was an up because of the recommendation. The NLRB took that, got the order. As you know, there are a number of cases from a number of circuits that — I'm looking to hear one from the 7th where they specifically state that pension contribution obligations have been, in quotes, enforced in a variety of circumstances absent a signature to a current collective bargaining agreement. Well, that's true, but that's not — those cases are distinguishable on — first of all, there were trust documents involved in those cases. The Henhouse case that the NLRB cites, it's dicta. They say if they're trust agreements, then the employer — then the fund can rely on a signed trust document. There's no trust document in our case. There's no document in our case that requires — other than our respondents won in the trial below. And George Sanders testified, Bobby — Robert Sanders testified that they never — that this so-called Schedule A, which isn't called Schedule A, they say it was never in the contract. And the union business agent said, I don't know what went out. I sent — my admin sent something out. I don't know what was in it. I don't know if there was a Schedule A in it. Then why did the company pay at the higher rate? At some point — at some point, they were told to do that. By whom? Presumably the union. So the union just stopped by and said, by the way, we didn't put this down before, but pay a little higher. I think so. That make sense to you? These are unsophisticated people. I get it. I get it. So — so it makes sense, but that's what the law was designed to prevent. All right. Thank you, counsel. You're over your time. Good — good morning. I was checking the clock. Good morning, Your Honors. Barbara Sheehy for the National Labor Relations Board. And as the clock indicates, five minutes is going to be taken by the Union Intervenor Counsel in this case. So I want to clear — I just want to take a step back a little bit, because I think there's still a little bit of confusion. The record isn't our friend all the time in this case, in terms of trying to figure out what happened. So I'm going to do my best to try to clear up some of that, because I think it's relevant. So there's a definitive — we don't know what happened with the payments when the rehabilitation plan went into effect. We know that an actuary in 2008 determined the fund critically — and in critical status. We know then that there was a recommendation by the trustees, a real — two different rehabilitation plans put forward. One of them ultimately went into effect. That was the default plan that included both escalated rates and lower benefits for the employees. The default plan went into effect. We don't know what — the record doesn't establish what payments the employer started making into the fund until, for some reason, April 2014. April 2014, we know the employer is paying at the elevated rates pursuant to the rehabilitation plan. Is that $8.18? $8.18, that's right. And so that was before the supposed meeting in December 1st of 2014? Absolutely right. April — right. They were not paying it pursuant to — right — what the Schedule A — but ultimately, the Schedule A comes in, right? I mean, it still becomes relevant except — But they were paying it before that rate. Right. And what we also know is that the — we know that when the employer stopped paying the escalated rates that happened in March 2016, we know that the pension fund issued a letter to the employer letting it know its last payment of March was significantly lower than what was required under the rehabilitation plan. We also know that the union filed a charge for underpayments to the fund. So even though there is no record evidence for what was happening between the time the rehabilitation rates went into effect and April 2014, the fact that there isn't, despite the subpoenas that were issued and despite the relationship between these parties being relatively amicable — Sorry. No, no, don't apologize. Despite all of that, the union doesn't file a charge — on this issue, at least — between 2008 and March 2016. And there's no evidence of any letter from the pension fund to the employer saying it's not making its payments. So we have — I guess the question I have, then — so you would have to agree that the course of conduct is not evidence of the Schedule A contract being — there being a meeting of mind on December 1st, correct? The course of — ask that again? I'm sorry. The course of Delta's conduct. That's one of the evidences that a contract was reached that the party complied with the contract, right? Ultimately, but I think the course of conduct after December 1st, certainly. But they acted before that, so that can't be — that doesn't help you. But did the new Exhibit A — did it reflect the increased payments under the rehabilitation plan? Yes, the 2014 — what we — Documenting what it was — the company was already required to pay in which it did starting in April. Right. Yeah, that makes — yes, but there's just no evidence that there was an agreement in April that they were bound to pay that. What we have — there's the Schedule A that comes in — you're right, comes in after the BAE contract is signed. And that's coming in in December — comes in December 1st, right. So the schedule that is outlining the payments, that includes the wage rates, the insurance premiums, and the contribution payments, the fund, gets incorporated into the contract. Can I ask one other question? Sure. Do you agree with my interpretation of the ALJ's decision that she did not find the new Schedule A incorporated? I would point — I don't think so, respectfully. I think if the Court looks at 44, Excerpts of the Record 44, the judge says — and it's — I don't know if your pages look the same as mine. It's the first column, left column. There's a paragraph that starts, The record evidence establishes — Yes, go ahead. Okay. The record evidence establishes that the expired contract both requires Respondents to make contributions to the fund, and that's in the amount of $1.95 at that point, as well as make appropriate surplus contributions to make up the unfunded liability. If you look at ER 40, she makes that determination based off the rehab plan being binding, not because they incorporated the Schedule A. Oh, I'm sorry. Maybe I misunderstood your question. I thought you were saying there wasn't any evidence from the ALJ at all that — or any finding from the ALJ at all that there was — that they were bound by contract to do this. I'm sorry. I misunderstood your question. I'm not bound by the Rehab Act or something else, but it seems the ALJ is saying they're not bound by the Schedule A. Right. But then you have what — you have the Board. You have the Board. So to the extent there's any inconsistency — Right. And I guess the Board didn't view it as an — Correct. Because they don't disavow. Normally, you'll see a disavow. Yeah. I think the Board had a different conclusion. And that's my second question. What deference does the Board have to give to the ALJ's findings? On a finding like that? I think that's a legal conclusion. Whether or not the Schedule A is incorporated, that's a legal conclusion? Well, it's an interpretation of a contract. So her factual findings would be due deference. But I think the ultimate legal conclusion to say that something — because you're defining the terms of the contract, right? So I don't know — I know, right? I'm not sure. I don't know because the Board doesn't grapple with that. So I'm not sure if the Board viewed that as deferred. Like, it certainly didn't — it couldn't have viewed it, given the way that it's written. It couldn't have viewed it as a factual determination. Because any time the Board is going to disagree factually with an ALJ, you'll see a disavow. You'll see in a footnote a disavow, a specific disavow from the Board, saying the ALJ found A. We disagree. We're going to find. Or what if it's a misreading of the ALJ's finding? And so, therefore, it's not entitled to substantial evidence deference? I think the Board — in this case, I think that what's a more reasonable thing is the Board looked at what she said. And she says you're bound by contract. And the Board — And by the Rehab Act. That's different than saying you're bound by Schedule A. You're bound by the contract to the extent that Section 18.4 contemplates this exact circumstance. So I think a reasonable reading is also — and the Board should be due deference on this — a reasonable reading is also that the Board's decision is actually not inconsistent. It might be fleshing out more of what they needed in terms — fleshing out more of what their view of the case was, which was Schedule A was incorporated into the parties' agreement. By 18.4, not necessarily by agreement of the parties? Except as of December 1st, 2000. Agreement by the — well, 18.4, to be clear, is — the parties agreed to that. But it's just a — it's advisory. They just have to discuss it. It doesn't mandate that they pay any specific amount. Right. But I would say the cases that are relied on — so this is sort of — I feel like I'm shifting tracks without being entirely clear. But one of the things I did want to — I'll do this now. One of the things — the cases don't require that — the level of detailed precision that the employer is suggesting that the LMRA here does. So we have — and this started off with Judge Wardlaw's questions at the very beginning — with what are the — what can we all agree on? And we can agree that the parties agreed to create a pension fund in the 2008 agreement. We can agree that the employer was paying $1.95 into that. We can agree that the employer recognized that if it's underfunded, the trustees have to do something, and that that — that that is a 302CB5 — a 5B compliant fund, because the employer — to be clear, the employer would not be paying the — if it thought that the very CBA did not create at all. I'm not comfortable, I don't think, saying what the — because what the board does is the board says that they look to the PPA to bolster its finding. So I don't know that the board — so the board doesn't rely on the Pension Protection Act. It uses it to bolster. I think that's, in fact, the very terminology that it uses. So I'm uncomfortable, I think, going farther to say what the board did. But as a legal matter, you don't think the PPA requires Delta to accept the rehab plan? I guess I — the board does say — the board says the PPA bolsters its — to the extent that — you're right, the board does say this — that if under the PPA, the trustees must take action to cure the financial instabilities. And under the employer's view, if it had to sign off on every incremental increase to keep the plan functioning, yes, that would violate the mandate of the PPA. The board does find that, yes. So I guess the bottom line for me is if we find that the schedule — the new Schedule A is not incorporated in the CBA, but that Delta is required to pay the heightened rates because of the PPA, is that consistent with Section 302? Does that comply with Section 302? So if you find that Schedule A is not — the December — it's called the December document — is not incorporated into the agreement, and the PPA — Requires them, Delta, to pay the heightened rates because of the rehab — according to the PPA. Certainly, yeah, because the board finds that the CBA on its own — the CBA through the on its own, that that is a document, and the law supports this, that that is a written document providing the detailed basis upon which payments could be made. And the board very firmly takes the position that to go the extra step to say — and on top of that, any time you need to increase payments, you have to come back to us for another detailed written assent to that. So I would say even if this Court disagrees — but I would say substantial evidence supports it — but even if the Court were to disagree that the document was incorporated in based on the — Sanders' behavior and Santana and the corroborating evidence from the secretary-treasurer, even if they were to find, I don't think that that — I think the board makes clear that that doesn't change the analysis, because the contract itself, 18.1, 18.4, and the conduct of the employer is going to get you over the line in terms of showing that there was a written basis sufficient under the MLRA, not the inflated view of what a written agreement constitutes under ELMA. Thank you, counsel. You're over your time. Thank you very much. Oh, and I'm sorry. It was Judge Smith. I'm sorry. Yeah, I get it. You got it. Right. I was looking at him. He didn't look like Judge Warthog. Good morning. David Rosenfeld for the union. Judge Bumenthal, the PPA does not require Delta to do anything because the PPA applies to the pension plan, which are separate entities. What happened in this case is not unusual in a declining industry like this. In 2008, everybody in the Bay Area knew that the ship repair industry was going away. When I came here in the 70s, it was very active. And so they knew that pension plan, which is actually a coast-wide plan, that they have to implement a program to protect it from the declining industry and eventually the lack of contributing employers. So the agreement says, you employers, all of you who are party, agree that the trustees, acting as they normally do, will establish a rehabilitation plan, which unfortunately meant very heightened pension contributions to deal with the fact that we now have virtually nobody left in this plan. BAE was the last standing ship repair company of any size in 2016. In 2017, which is in the record, they sold to Pulea Industries. Pulea came in and shortly realized that they'd been sold a bad deal, closed the yard, and filed bankruptcy. So there's nothing left. So the last standing contributing employer at this point of any small size, I believe, is Delta. And so what happened was, again, PPA didn't require Delta. It imposed a burden on the trust fund, which Delta, BAE, and the other few contributing employers accepted by the virtue of 18.4 in the agreement. But that's the hook. You think it's 18.4 that required them to accept that rehab plan? Right. And counsel's correct. At record 271 or 275, there's a list of contributions, and it shows that the heightened contributions were made by Delta at least as of April of 2014. So they were well aware of it, abided by the contribution plan. Let me just say there's a reason why all this is going on that I think is implicit in the record. Declining industry. Delta is a very specialized contractor. Sandblasting of marine vessels. It's a very difficult, specialized role. And its major contractor was BAE. So what happened was, every time that Delta would get a job with BAE, they just passed the cost through Delta. In fact, the prior contract required Delta, or required BAE, to subcontract only to an employer that paid the same wages and benefits. That changed in 2014, but apparently the record shows that in December of 2014, when Jose Santana went to the employer, Mr. Sanders, and said, look, I need you to sign the same agreement, he expressly said, I need you to sign the same agreement that BAE just agreed to in the summer of 2014. There have been extensive negotiations. And Mr. Sanders — But wasn't he referring only to the wages, not to the pension? No. It says — the transcript says expressly, to wages and benefits. So in other words, the transcript, which is at — it's 291. The express reference is Mr. Sanders is at — I mean, Mr. Santana says, I need you to agree to the same wages and benefits. And he says, yes. Not a fight. And that sounds unusual in collective bargaining negotiations, but the reason there was no fight was because he knew that he'd pass it through to BAE and remain their contractor for at least a period of time. And then in 2015, he begins negotiating his own agreement. Sorry, Counsel. Just 292, the question was, you testified that the only real issue was wages. And the answer was correct. 292 and 293. I think it said — I thought it said — it's atop of page 290. At bottom page 290, he says, talking over cell phones, referring to the negotiations, going back and forth, and basically just asking to agree with the wage, the wage rates, and the benefits. Just look about in 292. Yeah, and the wages were the issue because everyone knew he was going to agree to the benefit level. That wasn't in dispute. Because he knew he was bound by the rehabilitation plan. That's consistent with Sanders' son who said that the real issue was wages and not the pension and other benefits. True. And let me just point one thing out before I sit down, which is I think, Your Honor, you read the judge's decision a little narrowly because she says at the bottom, at the excerpt of Record 40, the left column and the top of the right column, that she refers to 18.1 provides for the contribution rate of $1.95 at the bottom of the page. Moreover, pursuant to its Article 18.4, respondent agreed to instruct the trustees and so on and develop a plan. And then the next paragraph refers to the increased rates. So I think she understood that it involved the rehabilitation plan. How do you explain the document in December 2014? From your perspective, what did that represent? Some sloppiness. But I think what happened was Mr. Santana met with Mr. Sanders, totally informal, and I think as Judge Smith pointed out, it was informal to some extent, sloppy, and Mr. Sanders agreed to sign the agreement. So he had this excerpt, this document prepared, which if you go back and look at the 2008 to 2014, looks like it and looks like the subsequent agreement in the same spreadsheet manipulated a little bit to add the increased health and welfare rate. And then when he met with Mr. Sanders, and let me just conclude with this point, Mr. Sanders said to Mr. Santana, can you make a change in the document? And the excerpt 140 is the document. And the request he made was that you change the effective date from July 2014, which was the effective date of the BAE agreement, to December of 2014. Mr. Santana said yes. So if you look at excerpt 140 at the top, there's a little initial, Jose Santana, JS, and there he changes the 7 to 12. Do you agree that ALJ gave a negative credibility finding to Santana, though? On other issues. Right. But it was negative. But not on this. Right? And it sort of made sense. He did it. And I want to point out that the employer said, well, it doesn't make much sense that the company wouldn't have signed it, but why did they need to? Because this was a benefit to the company to give a later date. And that document, in my view, is kind of critical. It shows Mr. Santana initialed it at his request, and that concluded the deal. Thank you. All right. Thank you very much, counsel. All right. You have one minute, but it's very late. Thank you, Your Honor. I'll be very brief. First of all, of course, it was an NLRB's burden of proof to prove that there was a mutual assent to increase the pension contributions. That was not done. Section 18.4 refers to a Schedule A. Schedule A, there's only one Schedule A, and that is in Respondents 1. And it didn't require Delta to accept the rehab plan. It only required making efforts. And that does not give the union or the trust or the NLRB a blank check to determine pension contributions. Thank you. All right. Thank you, counsel. Delta Sandblasting v. the NLRB is submitted, and this session of the Court is adjourned for the week. Thank you.
judges: Wardlaw, M. Smith, Bumatay